# EXHIBIT A

UNITED LAWYERS

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
--------------------------------------------------------------- X
JEAN-PHILLIPPE PIBOUIN,

                    Plaintiff,

          -against-

CA, INC. f/k/a COMPUTER ASSOCIATES
INTERNATIONAL, INC.,

                    Defendant.
--------------------------------------------------------------- :
                                                               X

Index No. 07- 05368
Date Purchased : 2/13/07

Plaintiff designates Suffolk County as the
place of trial.

The basis of the venue is that both plaintiff
and defendant reside in Suffolk County.

**SUMMONS**

Plaintiff resides at 4 Saint Jode Court,
Northport, NY 1____

FILED

FEB 13 2007

Judith Pascale
CLERK OF SUFFOLK COUNTY

To the above named Defendant:

**You are hereby summoned** to answer the complaint in this action and to serve a copy

of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance,

on the Plaintiff's Attorney within 20 days after the service of this summons, exclusive of the day of

service (or within 30 days after the service is complete if this summons is not personally delivered to

you within the State of New York); and in case of your failure to appear or answer, judgment will be

taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
       February 8, 2007

                    WECHSLER & COHEN, LLP

                    By:  /David B. Wechsler
                         Kim Lauren Michael
                         *Attorneys for Plaintiff*
                         17 State Street, 15th Floor
                         New York, New York 10004
                         (212) 847-7900

1

Defendant's address:

CA, INC.
One CA Plaza
Islandia, New York 11749

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK
------------------------------------------------------------------X
JEAN-PHILLIPPE PIBOUIN,

                         Plaintiff,

              -against-

CA, INC. f/k/a COMPUTER ASSOCIATES
INTERNATIONAL, INC.

                        Defendant.
------------------------------------------------------------------X

Index No. $07 - 05365$

**VERIFIED COMPLAINT**

       Plaintiff, JEAN-PHILLIPE PIBOUIN ("Pibouin"), by and through his attorneys, Wechsler &

Cohen, LLP, as and for his complaint against CA, INC., f/k/a COMPUTER ASSOCIATES

INTERNATIONAL, INC. ("CA"), respectfully alleges as follows:

### THE PARTIES

    1.     Pibouin is currently a citizen of France and a permanent resident of the United States,

residing in the State of New York, at 4 Saint Jode Court, Northport, New York 11768.

    2.     Upon information and belief, CA is a provider of IT management software,

headquartered in Islandia, New York. Pibouin was employed by CA from in or about March 1997

until in or about September 2006 at its office at One CA Plaza, Islandia, New York 11749.

### VENUE

    3.     Venue is proper in this Court since, among other things, CA is headquartered in

Suffolk County, CA does business in Suffolk County, Pibouin was employed by CA in Suffolk

County, and the claims and causes of action arose in Suffolk County.

### STATEMENT OF FACTS

    4.     Upon information and belief, CA is "one of the world's largest IT management

software providers." *See* Exhibit A.

FILED

FEB 13 2007

CLERK...

5.     Pibouin was born in France and lived there until in or around March 1997. Prior to joining CA in the United States, Pibouin worked in France for CA from September 1987 to April 1990, and from 1990 to 1997 Pibouin worked in various sales management positions for several United States information technology companies, including Sybase, Informix, and Cabletron.

6.     On or around March 5, 1997, Pibouin joined CA in the United States as a Global Account Manager.

7.     In 1997, Pibouin joined CA in its Islandia office.

8.     Pibouin's primary responsibilities for CA, first as a Global Account Manager, included managing some of CA's biggest and most strategic clients.

9.     From approximately 1998 to 2002, Pibouin worked as a Sales Manager, Divisional/Regional Vice President at CA. In 2002 and 2003, Pibouin was Sales Manager for the Northeast region of CA's Strategic Account Group ("SAG"), and in CA's fiscal year 2004 ("FY2004")[1] Pibouin was a SAG Sales Manager for the Mid-Atlantic area, leading a group of twelve Sales Executives ("SEs") and working on several accounts.

10.    Throughout his employment at CA, Pibouin received very good performance reviews. Pibouin's FY2004 review was solid and he completed FY2004 at more than 100% of his revenue quota. Moreover, Pibouin qualified for the Compass Club in FY2004, as he had previously, a prestigious award given by CA management in its sole discretion to employees who met 100% of their quota.

11.    On January 22, 2004, the United States Securities and Exchange Commission ("SEC") announced the first of several charges it would ultimately make against CA management for accounting fraud.

12.    At the end of FY2004, Pibouin was told that he would no longer be a SAG Sales

2

Manager but would be an Account Director Manager based out of Manhattan, with more SEs reporting to him and more accounts.

13.    In March 2004, Gregory Corgan ("Corgan"), the Senior Vice President of Sales for North America at the time, approved a particular deal with CIGNA and asked Pibouin and his group to complete the transaction, which, upon information and belief, would have provided $4 million in revenue.

14.    In April 2004, CA's Manhattan region moved from the Mid-Atlantic area of CA to the Northeast area, which was managed by George Fischer ("Fischer"). The day Pibouin moved to the Northeast area, he was made an Account Director ("AD"), rather than an Account Director Manager, as promised. Pibouin was assigned to only three accounts – a level lower than what he was promised, lower than his previous level, with no management responsibilities and at the same level as the former SEs who were previously *under his supervision*. For the first time since 1990, Pibouin had no management responsibilities. Further, despite his complaints, Pibouin's Incentive Compensation ("IC"), a representation of potential earnings based upon the achievement of personal sales quota, was reduced from $250,000 to $150,000. Therefore, the maximum amount of compensation Pibouin could achieve if he met his quotas was decreased by $100,000, despite that he had done nothing to merit this decrease.

15.    Pibouin received no salary increase for FY2005 and for the first time since FY1999 Pibouin did not receive any Stock Options for his achievements for FY2004.

16.    In May 2004, Corgan suddenly cancelled the CIGNA transaction just a week after it was signed. At the time, Fischer represented to Pibouin that Pibouin and his SE would get paid in June 2004 on the new "re-arranged" $3.8M deal that was ultimately re-signed. Notwithstanding this

---

[1] Upon information and belief, CA's fiscal year begins on April 1 and ends on March 31.

3

representation, upon which Pibouin justifiably and reasonably relied, Pibouin did not get paid until July 2005, *over a year* after he was supposed to receive payment, while his SE got paid on time (June 2004).

17.     Moreover, contrary to CA's promise and Pibouin's rights, Pibouin was ultimately paid only $11,000 instead of $84,000 for the re-signed CIGNA deal, a loss of over $70,000.

18.     CA's treatment of Pibouin with regard to the CIGNA transaction was all the more insulting considering that Pibouin had an extremely successful relationship with CIGNA (completing several strategic deals with CIGNA, including one in June 2003 for $8 million). Upon information and belief, Pibouin's group was the only team able to source any significant deals with CIGNA for the previous five years. Indeed, Pibouin's group received congratulations from CA Executive Management on their deals with CIGNA in 2002 and 2003. Upon information and belief, since June 2004, no other significant deals have been signed by CA with CIGNA.

19.     In July 2004 Fischer was promoted to Senior Vice President of Sales for North America and was replaced as Area Manager for the Northeast region by Bernadette Nixon ("Nixon"). At that time, Corgan was promoted to Senior Vice President of Worldwide Sales.

20.     On July 29, 2004, four months after the beginning of the new fiscal year, FY2005, Pibouin belatedly received his first Commission Plan ("WEP," standing for Wealth Enabling Plan). Upon information and belief, Pibouin's co-workers received their WEPs earlier, receiving initial WEPs in May 2004 as well as updated and final WEPs with revised commission rates in July 2004. Pibouin did not receive an updated and final WEP until October 2004. Pibouin repeatedly complained to CA management about this, seeking an explanation that was never provided.

21.     Pibouin never received any mid-year FY2005 performance review as mandated by CA policy. Having met 50% of his Booking Value ("BV") quota for the year by June 2004 (only

4

three months into the fiscal year), this review should have been excellent, reflecting Pibouin's excellent performance and commitment to CA despite the inexplicable demotion forced upon him.

22.    On September 22, 2004, CA announced that it had reached agreements with the Department of Justice and the SEC in connection with CA's improper recognition of revenue and related reporting practices during the period January 1, 1998 through September 30, 2000, and the actions of former CA employees to impede the investigation. Pursuant to the settlement, CA agreed to pay $225 million in restitution to shareholders and to make reforms to its corporate governance and financial accounting controls.

23.    On October 31, 2004, after sending several e-mails to CA management complaining about not receiving commissions owed to him, Pibouin's direct manager, Steve Perlman ("Perlman"), sent Christopher Palazzo ("Palazzo"), the Director of Sales Operations in North America, an e-mail concerning CA's failure to pay Pibouin any commissions seven months into the fiscal year. Perlman wrote: "This is absurd, what do you have to do to make sure we get him paid and that he doesn't have to wait until November's close? *JP [Pibouin] has been more than patient and has been one of the companies [sic] top contributors*." Exhibit B (emphasis added).

24.    In November 2004, Pibouin finally got paid only a portion of his commissions on an $8 million deal closed with JP Morgan Chase ("JPMC") in June 2004. Due to this deal, Pibouin was at 200% of his year-to-date quota by the end of the first quarter of FY2005. Unfortunately, this did not solve Pibouin's mistreatment by CA.

25.    Pibouin's commission rates listed in the WEP he received in October 2004 were wrong and inconsistent with those of Pibouin's teammate, Jennifer Foulides ("Foulides"), with whom Pibouin shared the management of the JPMC account and the revenue quota. Upon information and belief, Pibouin and Foulides had the same revenue quotas, so their commission rates

should similarly have been equal. Foulides received her payment on the JPMC deal, which was double Pibouin's payment, in August 2004, three months before Pibouin received his inexplicably low and inadequate payment. Pibouin complained to CA management, having sought payment for this deal since July 2004, as well as an explanation for this disparate treatment. CA ultimately paid Pibouin the additional commission he was owed on this deal in October 2005. CA provided no explanation for the delay, however, and instead attempted to justify the additional payment as an exception, without recognizing the basic mistake in commission rates listed on Pibouin's WEP.[2]

26.     In the second half of November 2004, CA changed the FY2005 Compensation Plan (nearly two-thirds of the way into the fiscal year). Pursuant to the amended plan, Booking Value quotas were cut in half, and half of the ADs' compensation would be derived from a new Average Annual Billings ("AAB") quota. This change was to be retroactive as of October 1, 2004.[3] The change to the FY2005 Plan had a greatly detrimental impact on Pibouin's earnings because Pibouin was already at 50% of his year-to-date quota and had several large transactions scheduled to close before the end of the fiscal year that were going to bring a great amount of booking value to CA.

27.     Also in November 2004, Pibouin was asked by Scott Hughes ("Hughes"), an employee in Sales Operations, not to open any further commission issues with CA's PeopleCall Center ("PCC"), a call center devoted to providing support to employees on several internal services including commissions. Hughes's explanation for this request was that Pibouin's commission issues were too voluminous and complex.

28.     In December 2004, Foulides and Pibouin were working on a $50 million deal with JPMC scheduled to close by the end of FY2005. CA ordered that Foulides, rather than Pibouin, lead

---

[2] Pibouin was forced to sign the erroneous WEP, as he would not have received *any* commissions had he refused to sign and attempted to get the WEP fixed (an attempt that, upon information and belief, would have been futile).
[3] Pibouin justifiably relied on receiving compensation pursuant to the original FY2005 Compensation Plan in remaining at and rendering services to CA.

Exhibit A     Exhibit B     Exhibit C     Exhibit D     Exhibit E     Exhibit F

in negotiating the deal. When Pibouin inquired as to the reason for this, his direct manager Perlman simply stated that Foulides had to learn how to work on a large deal such as this and that Pibouin could not contact the client any more to talk about the deal. Notably, on March 1, 2005, during a discussion related to Pibouin's performance review, Perlman told Pibouin that he considered Foulides to be a "junior" AD whereas Pibouin was a "senior" AD. CA's treatment of Pibouin, however, was inconsistent with this appropriate categorization.

29.     In February 2005, Pibouin was removed from dealing with his other large CA client, AXA. Pibouin and his team worked on the AXA account for approximately seven years and booked more than $120 million of products and services revenue for CA. On many occasions, these successes were recognized by CA management, as well as by AXA. While on vacation in France in February 2005, Pibouin spent time preparing for meetings he set up in France with AXA scheduled for February 18, 2005. The day before the meeting, however, at 2:04 a.m. in Paris, Pibouin received an e-mail forbidding him from attending this or any other meetings with AXA. Pibouin called Perlman, who told Pibouin that Pibouin was removed from the AXA account for the remaining fiscal year pursuant to a "management decision" and that he would get new client attributions in April 2005. This decision damaged Pibouin, as the $20 million deal Pibouin was working on for AXA was signed six months later as a nearly identical deal, and brought the ADs newly allocated to AXA to more than 100% of quota achievement.

30.     During the same vacation, Pibouin received his year-end performance review for signature at 4:18 p.m. Eastern Standard Time (10:18 p.m. in Paris, where Perlman knew Pibouin was staying) on the last day of the deadline to complete performance reviews. Perlman did not contact Pibouin in advance to discuss the review, as required by CA policy. Pibouin was directed to sign the review, since the deadline was imminent. Pibouin immediately called Perlman and told him that he

7

could not sign the review because he disagreed with its contents and wanted to discuss it. Pibouin's primary issue was that he was rated as "partially achieved expected results," which is the second worst grade after "doesn't meet expectations." This was the first time Pibouin received such a grade in his then eight-year career with CA, having never previously received lower than "meets expectations" or "achieved expected results." Perlman replied that they could talk when Pibouin returned to New York, and that Perlman would have to ask for guidance from management, namely Nixon and Fischer, because Perlman could not change the review.

31.    Pibouin and Perlman ultimately met on March 1, 2005 to discuss Pibouin's review. Pibouin laid out his issues with the review, including without limitation:

(i)    The review was inconsistent with what Perlman told Pibouin in the months preceding the review (Perlman had told Pibouin that he was pleased to have Pibouin on his team and he was very happy with Pibouin's work) -- in other words, Pibouin had no warning that he was only "partially achiev[ing] expected results";

(ii)    The review was inconsistent with what Fischer had told Pibouin on several occasions, namely, that Pibouin was one of the best senior ADs in North America;

(iii)    The review was inconsistent with Pibouin's results in term of quota achievement; at the end of the second quarter Pibouin was already at 100% of his BV the time of the review;

(iv)    The review was inconsistent with Pibouin's and CA management's expectations of Pibouin in terms of revenue expected to be closed for his territory. Pibouin was expected to be above 150% of his quota by

8

the end of the fiscal year as he was working on the $50 million JPMC deal, one of the biggest deals in CA North America, and had been working on the $20 million AXA deal before being inexplicably removed from the account (just two days before the review was issued);

(v)    The review was inconsistent with what other CA employees had said about Pibouin to him and, upon information and belief, amongst themselves;

(vi)    The review was not accurate in various respects, including without limitation that the goals and development given to Pibouin by Perlman were new to him and did not match any of the conversations Pibouin had with Perlman regarding the improvements Pibouin should seek to make.

(vii)    The review was not aligned with, and in some ways was contradictory to, Pibouin's previous reviews.

32.    By e-mail, Pibouin asked several times for explanations regarding the review and for details regarding Perlman's discussions with CA management. Following Pibouin's meeting with Perlman to discuss his review, Pibouin attempted to contact Perlman several times by telephone (leaving voicemails) and by e-mail, but Pibouin received no response.

33.    By the end of April 2005, unlike his co-workers, Pibouin had not been paid his commissions on more than 20 AXA, JPMC and Sociéte General ("SG") deals on which he worked. Moreover, Pibouin discovered more than forty mistakes and/or inconsistencies within his commission statements. Despite Pibouin's repeated attempts to be fairly paid, CA continued to refuse to pay Pibouin the commissions owed to him, purporting to need further information and

explanations for the discrepancies (information and explanations that had already been provided by Pibouin).

34.     Pibouin completed FY2005 at 150% of his Product Quota (BV) and 100% of his Services Quota. Pibouin once again qualified for the Compass Club. Nevertheless, Pibouin did not receive any increase in his base salary or bonus for the new fiscal year (FY2006) while, upon information and belief, some of his teammates received such increases even though they did not match Pibouin's quota achievements. Further, in addition to the fact that Pibouin received no salary or bonus increase and was owed on his commissions, as in FY2004 no stock options were allocated to Pibouin despite his exceptional achievement in FY2005.

35.     To make matters worse, as with AXA, Pibouin was removed from the JPMC account at the beginning of FY2006 (April 2005), even though most of Pibouin's revenue in FY2005 was generated from working with JPMC. CA again did not give Pibouin any reason for this development, but gave him a new territory with two new accounts. These accounts, however, Thomson Corporation ("Thomson")[4] and Goldman Sachs, were well-known to disfavor CA and were reluctant to engage in significant business with CA. Upon information and belief, neither company had purchased any meaningful new technology from CA in the previous approximately seven years. Pibouin was now in the unfortunate position of having to rely on these clients for all of his commissions.

36.     In April 2005, Pibouin reached out to Perlman to ask if he could be considered for a management position for FY2006 because of his excellent performance in FY2005 in terms of quota achievement and given that FY2005 was the first time since 1990 that Pibouin was not in a managerial position. Perlman replied that he believed Pibouin was interested in being a Sales

---

[4] Pibouin dealt with Thomson Corporation as well as its affiliates and/or subsidiaries. The term "Thomson" as used herein shall include such other companies.

10

Executive, a much lower position than Sales Manager, and one that Pibouin had not held since 1988. Rather, Pibouin was a *supervisor* of Sales Executives in the United States for the past seven years. This response was unwarranted and highly disrespectful to Pibouin.

37.     In May 2005, Pibouin received his expected quotas for FY2006 for his two new accounts, Thomson and Goldman Sachs. Due to the difficult nature of the accounts, these quotas were unreasonably high, especially given:

> (i)     upon information and belief, these two accounts did not buy a single new product from CA for approximately the previous five years, which, upon information and belief, was very rare in the New York area;

> (ii)    the companies' sizes as compared to Perlman's other accounts;

> (iii)   the quotas were in direct contrast to CA's management's directive that all quotas were to be "opportunity based," *i.e.,* calculated in direct relation to the current revenue forecast; Pibouin's quotas were not "opportunity based" because CA's own current revenue forecasts for these clients were close to nothing;

> (iv)    CA had a bad relationship with these two clients who did not want to meet CA at the senior and executive management levels; and

> (v)     The team (SEs and management) covering these accounts was completely new to these accounts, with no prior relationships, extensive knowledge, or even business plans on how to approach these difficult clients.

Pibouin attempted to address these unreasonable quotas with CA management, to no avail. In plain terms, Pibouin was being set up to fail.

38.    Pibouin also learned in May 2005 that he had achieved at least 150% of his Average Annual Billings Quota ("AAB") for FY2005, but was never given an exact quota achievement number nor the details on how it was calculated.

39.    In or around June 2005, over two months *after* the end of FY2005, without any warning or explanation, CA wrongfully attempted to *retroactively* cap the commissions for ADs who met or surpassed 150% of their AAB quotas in FY2005. This was inconsistent with: (a) the terms of the FY2005 Compensation Plan, which was in effect for the entirety of FY2005; and (b) what Pibouin and other ADs were told by CA management at the end of 2004, namely, that one of the benefits of a change from pure BV quotas to half BV and half AAB quotas was that there would be no cap applied on the AAB piece. Pibouin justifiably relied on management's representations and the FY2005 Compensation Plan in remaining at and rendering services to CA in FY2005.

40.    CA also decided to use the FY2006 Compensation Plan to calculate the AAB achievement numbers instead of the FY2005 Compensation Plan. Upon information and belief, these decisions had a negative impact on Pibouin's total AAB FY2005 due to the size of the quota and his high achievement number. To make matters worse, Pibouin cannot calculate the exact loss he incurred from these decisions because he was never given his actual AAB quota achievement for FY2005 using the original FY2005 Compensation Plan. Pibouin repeatedly objected and complained to CA management about these retroactive changes.[5]

41.    Upon information and belief, other ADs were granted exceptions to be paid commissions outside of the Compensation Plan for certain deals. All of Pibouin's requests for such exceptions were denied without a fair explanation.

_____

[5] In general, the e-mails Pibouin sent concerning problems with his commissions did not get appropriate attention. For example, upon information and belief, Hughes completely ignored one of Pibouin's e-mails concerning his outstanding commissions, dated July 27, 2005, until finally reading it on June 7, 2006 (just three months before Pibouin was terminated without cause).

12

42.    In November 2005, CA again changed the way AAB quota and AAB achievements for FY2006 were calculated. As a result, Pibouin's AAB quota was increased from $726,611 to $2,683,000.

43.    In December 2005, Pibouin's mid-year review was conducted by his new manager, Clare Cunniffe ("Cunniffe"), who had only been in the position for one month. The review categorized Pibouin as "below expectations," which had never before happened in his eighteen-year professional career. This review, like his FY2004 review, neither respected nor reflected Pibouin's professional and diligent hard work, especially considering the progress Pibouin was making with two of CA's most difficult accounts. When Pibouin asked for an explanation for this rating, he received no adequate substantive response.

44.    In January 2006, Pibouin received an e-mail with a subject of "Action Plan for Performance FY06 Q4." This e-mail included milestones Pibouin was required to reach and required Pibouin to submit detailed activity reports, all in a four week time frame. Though Pibouin was told that all salespersons not at 30% of their New Contract Value ("NCV") quota at that point received this e-mail, Pibouin was at more than 35% of his quota, which was unrealistic in the first place given that his accounts were reluctant to do business with CA (a belief Pibouin expressed to CA management). Additionally, this "improvement plan" did not take into consideration that Pibouin had one of the biggest deals to close in the fourth quarter of 2005 (an $18 million deal at Goldman Sachs) or the progress he made building a revenue pipeline with these two difficult clients. Pibouin responded to this e-mail, outlining the reasons why the e-mail was inaccurate. The four week deadline passed, and Pibouin never received any feedback or comments from management.

45.    In February 2006, Pibouin was removed from most internal discussions regarding strategy planning concerning an $18 million deal to close before the end of FY2006 with Goldman

13

Sachs, and received an e-mail from Perlman forbidding Pibouin from calling the client. This is contradictory to the job description of an AD, defined by CA as someone who "owns all aspects of the relationship between the customer and CA." *See* Exhibit C. The deal on which Pibouin did most of the work until January 2006 ultimately closed on or around March 31, 2006. On April 18, 2006, Pibouin received an e-mail from Goldman Sachs's Chief Operating Office thanking Pibouin for his efforts in forging the deal. *See* Exhibit D.

46.    In or around the end of FY2006, with the vast majority of Pibouin's FY2005 commission issues remaining unresolved, Pibouin opened several PCC issues (meaning questions or complaints about his commissions). Pibouin, however, was subsequently asked by Jean Schultz ("Schultz"), the Director of Northeast Sales Finance who worked on commission issues for the Northeast area, to limit the number of his PCC issues.

47.    On or around March 1, 2006, during a team meeting in the Manhattan office, when Pibouin referred to a client contact with a strong accent, Perlman looked at Pibouin and said: "I hate people with strong accents." Pibouin was shocked and offended by this insulting and discriminatory statement. Upon information and belief, a similar statement was made by Corgan in or about the first quarter of FY2005 at a CA team meeting during which Corgan stated that there were a lot of non-Americans at the CA management level.

48.    Upon information and belief, Pibouin finished the FY2006 year at approximately 247% of his AAB quota and 85% of his NCV quota. Upon information and belief, this was one of the best quota achievements in Perlman's group and extremely strong especially considering the difficult nature of the accounts to which Pibouin was assigned and the roadblocks CA put in Pibouin's path.

49.    On April 3, 2006, the day before the FY2007 Kick Off, Pibouin received an e-mail

14

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

requesting him to go to training sessions that were for SEs not ADs. That day, Pibouin sent Perlman an e-mail asking why he (*i.e.,* Pibouin) received this e-mail. Perlman responded by asking Pibouin to see Perlman the next day. On April 4, 2006, the day of the FY2007 Kick Off, Perlman told Pibouin that Pibouin was being demoted from an AD to an SE position selling a single line of products to a list of clients that would be provided at a later date. The last time Pibouin was an SE was sixteen years earlier, in 1990.

50.     It was not until three weeks later, however, that four accounts were provided to Pibouin. These accounts included Goldman Sachs and Thomson, meaning Pibouin had to continue to deal with these clients and explain to them why he was demoted. Upon information and belief, Pibouin's AD position was taken over by an employee who did not achieve his quotas in FY2006, who was at least ten years younger, and who did not know the financial services industry as well as Pibouin. As a result of this demotion, Pibouin's IC was further reduced from $150,000 to $120,000 (a $130,000 total reduction from Pibouin's previous IC of $250,000), resulting in yet further lost commissions if Pibouin reached 100% of his quota.

51.     On April 26, 2006, Pibouin had his FY2006 year-end performance review with Cunniffe, who was an hour late and had sent Pibouin his Performance Appraisal only five minutes before they finally met, giving Pibouin virtually no time to analyze the review and prepare for the meeting. Pibouin received a rating of "Partially achieved the expected results." As with Pibouin's FY2005 mid-year review from December 2005, this review was inconsistent with the facts and Pibouin informed Cunniffe that he adamantly disagreed with the contents of the review and that he would: (a) only sign the review for acknowledgment; and (b) add a comment emphasizing his disagreement.

52.     Pibouin further stated that his desire was to remain with CA and continue to build on

15

what he started, but he wanted (a) his compensation shortfalls addressed and resolved, so that his energies could be focused exclusively on growing the business; (b) a reversal of his demotion, which never should have occurred in the first place and was, like his review, entirely inconsistent with any good faith, objective and subjective analysis of the facts; and (c) support from CA management. Pibouin also candidly stated that if CA was trying to send him a message that it does not view him as a valued long-term player with a future in the organization, it should just be straight with him and assemble a separation package.

53.    On May 2, 2006, Pibouin sent one of many e-mails to CA management requesting resolution of his FY2005 commission issues (including his failure to be paid, inconsistencies and mistakes, and improper calculations), stating that he had been requesting explanations and responses for approximately eighteen months yet most issues were still outstanding.  In response, Pibouin received an e-mail from Schultz stating that she and Tara Prosser, who was taking over Schultz's position, were meeting that day to go through Pibouin's "outstanding [FY2005 commission] issues." After this e-mail, however, Pibouin did not receive any satisfactory resolution of most of his commission issues.

54.    On May 7, 2006, Pibouin sent Andrew Goodman ("Goodman"), CA's General Counsel, an e-mail detailing the comment by Perlman concerning "strong accents." Pibouin stated that:

> [T]his is not the first comment of this sort made by CA personnel, and – coupled with the recent diminution in my title and role at CA – I believe it necessary to bring this to your attention. The negative and disparate employment treatment I have been suffering is inconsistent with any good faith objective and subjective assessment of my performance, and hence unwarranted. As a result, I question what are the real reasons underlying my deteriorating situation at CA . . . [N]otwithstanding my above-noted concerns and my ongoing compensation and other employment issues with CA, I shall continue to diligently perform my role for CA in the most professional of

16

Exhibit E.

55.    On May 8, 2006, Goodman responded, stating "JP, I appreciate you taking the time to write to me, you can be assured that we will follow-up and be in touch with you shortly regarding the issues you raise." *Id.*

56.    On May 8, 2006, Pibouin received confirmation from his management that CA was once again *retroactively*, over a month after the end of FY2006, changing the FY2006 Compensation Plan. CA cancelled the payment of the 10% IC bonus for quota achievement greater than 150% and payment of the MBOs. CA also canceled one of the two trip award programs for FY2006, the "Winner's Circle," for which, upon information and belief, Pibouin would have been eligible.[6]

57.    Moreover, CA decided to enforce a rule on Pibouin (and perhaps others) that existed in the FY2006 Compensation Plan but was never applied to him (and perhaps such others) before during the fiscal year.    The rule concerned "billing normalization" which capped "billing" achievement. This "billing normalization" had a great negative impact upon Pibouin because of his 247% "Billing" achievement, which was "normalized" to 171%. Pibouin justifiably relied on the original FY2006 Compensation Plan in remaining at and rendering services to CA in FY2006. Upon information and belief, these changes cost Pibouin over $120,000, or at least one-third of what his total compensation should have been.[7]

58.    Moreover, once again Pibouin received no base salary increase for FY2007 or stock allocations despite his FY2006 results.

---

[6] While the Compass Club trip to which Pibouin was not invited was at management's discretion (though based upon Pibouin's performance, he should have been invited), Pibouin certainly should have been invited to the Winners Circle, which was based upon achieving 100% of his quota.

[7] Upon information and belief, certain CA employees were told that they would receive a certain amount of money that had been set aside to reimburse those who, *inter alia,* were negatively impacted by the change in the Compensation Plans as a "retention" bonus. CA management never discussed with, offered, or provided to Pibouin any such monies.

17

59.     On May 10, 2006, Pibouin met with Anjali Jamdar ("Jamdar"), who worked in CA's Human Resources department, to discuss Pibouin's ongoing concerns regarding his compensation, and the discrimination and harassment to which he had been subject. At the end of the meeting, Pibouin was to send Jamdar a copy of his May 2, 2006 e-mail concerning commissions as well as the January 2006 "Action Plan for Performance" e-mail and Pibouin's response. Pibouin sent these e-mails to Jamdar that same day.

60.     Pibouin worked on the Merrill Lynch account with another CA employee, Tom Little ("Little"), though the two handled different lines of products. After Little resigned, Pibouin was told on May 17, 2006, again without good reason, that despite having been in meetings with Merrill and Little (and therefore being quite knowledgeable about Little's business with Merrill Lynch), Little's Merrill Lynch business would be handled and closed by CA management. Upon information and belief, this is inconsistent with CA's usual practice and procedure.

61.     On May 18, 2006, Pibouin received a voice mail from Jamdar stating that she was still looking into the matters Pibouin raised when they met on May 10th.

62.     On May 24, 2006, as requested by Jamdar in the May 10th meeting, Pibouin provided Jamdar a written summary of his grievances noting that, *inter alia*, his "2005 and 2006 commissions remain unpaid, the methodology for determining them remains . . . improper, and [he] remains [in] a greatly diminished role for no good faith reason." Pibouin also noted that "for the first time in [his] life [he] ha[s] had to undergo a series of tests for heart problems (including palpitations)" and has had to take some sick days "for the first time in [his] business life." Pibouin demanded that CA begin treating him equitably and lawfully or, in the alternative, having already been constructively discharged by CA, that CA assemble a severance package for him. Upon information and belief, Jamdar did not even read this e-mail until June 6, 2006 (two weeks later).

18

63.     On June 5, 2006, counsel for Pibouin e-mailed Goodman, outlining how CA had made Pibouin the subject of unlawful disparate and discriminatory treatment. Pibouin's counsel was contacted by Joel Katz ("Katz"), CA's Vice President and Assistant General Counsel, who replied that CA was "looking into the issues that Mr. Pibouin reported to CA's HR organization" in May 2006.

64.     At the same time as his counsel was endeavoring to ameliorate the situation in which CA had placed Pibouin, Pibouin continued to attempt to put an end to the discrimination he was facing and receive his long overdue compensation by communicating with CA management. In June 2006, however, Pibouin received yet *additional* e-mails from CA reiterating prior inaccuracies and stating CA needed yet more information from Pibouin. Nevertheless, Pibouin continued communicating with CA management in an effort to resolve the situation.

65.     On June 16, 2006, two and a half months after the beginning of FY2007 and after numerous requests by Pibouin for his FY2007 quota, Pibouin was officially informed that his FY2007 IC target was $120,000 (still down from $150,000, which was again down from $250,000 two years prior) but his quota was increased from $2,000,000 to $2,700,000. Upon information and belief, this was a dramatic increase in quota compared to other CA employees and was also inconsistent with Cunniffe's earlier statement to Pibouin that his quota would be less than $2,000,000 (an unrealistically high quota even at that level).

66.     On June 29, 2006, Pibouin met again with Jamdar to discuss his discrimination and compensation issues, but little progress was made. Jamdar again requested more information from Pibouin and told Pibouin that she would set up a meeting with Hughes to discuss commissions and would continue to investigate.

67.     On July 27, 2006 Pibouin met with Jamdar, Hughes, and Perlman concerning his

commissions but CA merely continued its delay tactics, yet again asking for *additional* information, and refusing to pay Pibouin the compensation he was owed.

68.     Pibouin also met with Jamdar alone on July 27, 2006 concerning his discrimination claims. During this meeting, Jamdar informed Pibouin that CA would not contact witnesses to the "strong accent" comment made by Perlman who were no longer employed by CA even though Perlman and the only three other witnesses interviewed said they could not remember what occurred. CA's failure and refusal, despite Pibouin's request, to contact the other four witnesses to the comment renders CA's "investigation" incomplete, illusory, and discriminatory.

69.     On August 29, 2006, a follow-up meeting between Pibouin, Perlman, and Hughes took place to discuss Pibouin's commissions, but little was accomplished with Pibouin once again being asked to provide support for his claims (though ample support had already been provided).

70.     Despite the obstacles Pibouin was facing from CA management, he remained committed. In fact, because CA management had stressed that its employees should find any deal possible given that revenue was low, Pibouin sent a proposal to Thomson Corporation who signed a contract accepting the proposal the very same day for $36,864. Upon information and belief, such a fast turnaround was extremely rare at CA.

71.     On September 5, 2006, Pibouin's counsel sent Katz an e-mail, as per Katz's request, with a demand in light of Pibouin's claims. Just two days later (while Pibouin was in the process of gathering even more support for his commission claims), Pibouin was called into a meeting by Cunniffe, who told Pibouin it was to discuss his "goals" for FY 2007. At that meeting, however, CA suddenly and inexplicably terminated Pibouin's employment without cause, purportedly as part of a layoff. This termination was both discriminatory and in retaliation for Pibouin's complaints, made in an attempt to receive that which was rightfully owed to him.

20

72.     At the time of his termination without cause, Pibouin was owed, in addition to compensation for FY2005 and FY2006, commissions for FY2007. Moreover, due to his unlawful termination, Pibouin will be unable to exercise the totality of the CA stock options he already owned, resulting in a substantial loss to Pibouin.

73.     Subsequent to his termination, CA offered to Pibouin a severance package of $52,730.77. This payment, however, was contingent upon Pibouin's execution of a Separation Agreement and General Claims Release, pursuant to which Pibouin would waive all claims he had against CA including any claim for discrimination as well as any claims he had for past-due commissions or bonuses earned prior to the ninety day period preceding his termination. For the foregoing reasons, Pibouin refused to sign the release and, to this day, he has not received any severance from CA.

74.     In sum, although from the beginning of FY2005 Pibouin did not have the full support of CA, while other employees did, the lack of which was detrimental to his ability to maximize his performance, Pibouin was diligent and creative in overcoming the impediments he faced from CA. For example, over and above having great success in FY2005, despite the historic negativity Goldman Sachs and Thomson had for CA (accounts on which Pibouin was placed, accounts on which CA expected Pibouin to fail, and accounts on which Pibouin succeeded prior to being removed from crucial business planning), Pibouin succeeded in FY2006 in building a strategic business relationship with them from scratch. In addition to the fact that Pibouin did a job that belongs to an AD, not a demoted SE as he was, the relationships Pibouin built with Goldman Sachs and Thomson should allow for increased business for CA in years to come. While Pibouin questioned matters at times, including CA's continued failure to timely and fully pay his commissions (questions that received no answers), Pibouin never let this interfere with his efforts.

21

Pibouin's objective FY2005 and FY2006 performance data versus budget establishes his excellent performance.

75.    Based upon CA's Compensation Plans, Pibouin had a reasonable expectation of receiving a certain amount of compensation for the fiscal years 2005 and 2006 commensurate with his performance, and justifiably relied on such payment in remaining at and rendering services to CA during those years.

76.    Upon information and belief, CA's retroactive changes to its FY2005 and FY2006 Compensation Plans were made between the day CA pre-announced its financial results to the public and the day CA officially announced the results.  Upon information and belief, this was improper and/or was an illegal manipulation of CA's financials in an attempt to meet certain financial results. According to the press, "this spring, CA realized quarterly commissions costs would be $75 million larger than expected" and that "CA has endured an embarrassing run of mostly self-inflicted calamities" including "two accounting restatements, a late 10-K, an earnings miss, a bond downgrade, *a fiasco over sales commissions* and an exodus of executive talent."  Exhibit F (emphasis added).

77.    CA's misconduct constitutes a breach and/or anticipatory breach of the Plans.

78.    CA's continued failure and refusal to pay Pibouin his Severance Package is intentional, willful, and in wanton disregard of Pibouin's rights.

79.    Pibouin is still owed reimbursement for CA business expenses, which he has requested but CA has failed and refused to provide.

80.    All amounts due Pibouin by CA constitute "wages" under the Labor Law of the State of New York.

22

81.    Based on CA's conduct, Pibouin is entitled to not only payment of all amounts due him and interest, but also a 25% statutory sanction and attorneys' fees.

82.    With respect to Pibouin's claims, they are: (a) for compensation for prior services provided by him to CA; (b) for severance; (c) damages for national origin discrimination; and (d) for compensation based on a series of unfulfilled promises, commitments and representations, all knowingly and intentionally made to him by CA.

83.    Consequently, Pibouin requests that the Court render a decision and issue a judgment in his favor, among other things, for:

      (i)     past due and owed compensation for the valuable services Pibouin rendered to CA in the fiscal years 2005, 2006, and 2007, consistent with the parties' express and/or implied agreements in place at the time Pibouin's services in those years were rendered, which shall be determined after discovery;

      (ii)    past due and owed reimbursement for various expenses incurred by Pibouin in the performance of duties for CA, in an amount to be determined at the hearing;

      (iii)   severance, pursuant to CA policy;

      (iv)   statutory sanctions pursuant to New York's Labor Law;

      (v)    compensatory and punitive damages based on CA's unlawful discrimination; and

      (vi)   attorneys' fees, interest, costs, and other expenses.

## COUNT I

## BREACH OF CONTRACT

84.    Pibouin repeats and realleges the allegations set forth in paragraphs "1" through "83"

above, as though fully set forth herein.

85.     CA's misconduct constitutes a breach of the parties' express and/or implied contract(s).

86.     Pibouin is entitled to damages believed to be in excess of $750,000, plus interest, attorneys' fees, costs, and disbursements.

**COUNT II**

**QUANTUM MERUIT**

87.     Pibouin repeats and realleges the allegations contained in paragraphs "1" through "86" above, as though fully set forth herein.

88.     As an aggrieved employee, Pibouin may elect to sue for compensation in *quantum meruit* to recover the reasonable value of the services performed.

89.     Such amount is believed to be in excess of $750,000, plus interest, attorneys' fees, costs, and disbursements.

**COUNT III**

**UNJUST ENRICHMENT**

90.     Pibouin repeats and realleges the allegations contained in paragraphs "1" through "89" above, as though fully set forth herein.

91.     Alternatively, even if it were to be found that there was no express or implied agreement between CA and Pibouin, Pibouin is nonetheless entitled to appropriate relief under the theory of unjust enrichment and/or restitution: (a) CA has denied Pibouin the compensation he earned and to which he is entitled; (b) Pibouin enriched CA with his services; and (c) Pibouin reasonably relied on receiving fair payments from CA.

92.     CA's conduct has directly damaged Pibouin in an amount believed to be in excess of

24

$750,000, plus interest, attorneys' fees, costs, and disbursements.

## COUNT IV

### NEGLIGENT AND/OR FRAUDULENT MISREPRESENTATION

93.     Pibouin repeats and realleges the allegations contained in paragraphs "1" through "92" above, as though fully set forth herein.

94.     The aforesaid representations made by CA to Pibouin, were made with the intent of enticing and inducing Pibouin to continue his work for CA.

95.     CA's aforesaid promises and/or representations were justifiably relied upon by Pibouin, to his detriment. Such promises and representations made by CA were either knowingly false when made, were made with reckless indifference to the fact that Pibouin would be relying on them, or were negligently made to Pibouin with the expectation that Pibouin would rely, as he did, on same.

96.     As a result of CA's wrongful conduct, Pibouin has suffered and continues to suffer significant damage believed to be in excess of $750,000, plus interest, attorneys' fees, costs, disbursements, and punitive damages.

## COUNT V

### PROMISSORY ESTOPPEL

97.     Pibouin repeats and realleges the allegations contained in paragraphs "1" through "96" above, as though fully set forth herein.

98.     Sufficiently clear and unambiguous oral promises were made to Pibouin.

99.     Pibouin reasonably relied on the promises by CA.

100.    As a direct result of his reasonable reliance on CA's promises, Pibouin suffered significant damages in amounts to be established at trial but believed to be in excess of $750,000, plus interest, attorneys' fees, costs, disbursements, and punitive damages.

25

COUNT VI

## VIOLATION OF NEW YORK STATE EXECUTIVE LAW

101.    Pibouin repeats and realleges the allegations contained in paragraphs "1" through "100" hereof as if fully set forth at length herein.

102.    The acts committed by CA constitute an unlawful discriminatory practice against Pibouin based on his national origin in violation of New York Executive Law §296(1)(a) (the "New York State Human Rights Law").

103.    Pibouin, a French citizen, is a member of a protected class.

104.    The acts of which Pibouin complains herein support his claims for national origin discrimination, took place as a result of his membership in a protected class, and all took place while he was an employee of CA and in the course of his employment with CA.

105.    The acts and conduct complained of herein support Pibouin's claims for national origin discrimination, were committed by CA personnel, including but not limited to Perlman, who possessed and maintained direct supervisory authority over Pibouin, and for whose acts CA is liable.

106.    The acts and conduct complained of herein support Pibouin's claims for national origin discrimination, were used as a basis for decisions affecting the terms, conditions, and privileges of Pibouin's employment, and continued up to and including the date of his termination without cause from CA.

107.    As a direct and proximate result of CA's conduct, Pibouin has suffered and will continue to suffer from, among other things, a significant loss of reputation and income benefits as well as other losses associated with the effects of CA's conduct upon Pibouin's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the

26

conduct complained of herein.

108.    The discriminatory conduct of CA so degraded Pibouin physically, mentally, and emotionally that, as a proximate result of the violation by CA of his civil rights, Pibouin has suffered, and will continue to suffer, among other things, mental and emotional injuries.

109.    As direct and proximate result of CA's violation of Pibouin's rights under the New York State Human Rights Law, CA is liable to Pibouin for compensatory damages pursuant to §297(4)(c)(iii) of the New York State Human Rights Law in the sum of $1,500,000.

110.    Pibouin therefore seeks judgment against CA in an amount to be determined at trial but not less than $1,500,000 for compensatory damages, together with costs, disbursements, and attorneys' fees.

## COUNT VII

## VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE

111.    Pibouin repeats and realleges the allegations contained in paragraphs "1" through "110" hereof as if fully set forth at length herein.

112.    The acts committed by CA constitute an unlawful discriminatory practice against Pibouin based on his national origin in violation of New York City Administrative Code, Title 8, Chapter 1, §8-107(1)(a) (the "New York City Administrative Code").

113.    Pibouin, a French national, is a member of a protected class.

114.    The acts of which Pibouin complains herein support his claims for national origin discrimination, took place as a result of his membership in a protected class, and all took place while he was an employee of CA and in the course of his employment with CA.

115.    The acts and conduct complained of herein support Pibouin's claims for national discrimination and were committed by CA personnel, including but not limited to Perlman who

27

possessed and maintained direct supervisory authority over Pibouin, and for whose acts CA is liable.

116.    The acts and conduct complained of herein supporting Pibouin's claims for national origin discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Pibouin's employment continuing up to and including the date of his termination from CA.

117.    As a direct and proximate result of CA's conduct, Pibouin has suffered and will continue to suffer from, among other things, a significant loss of reputation and income benefits as well as other losses associated with the effects of CA's conduct upon Pibouin's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

118.    The discriminatory conduct of CA so degraded Pibouin physically, mentally, and emotionally that, as a proximate result of the violation by CA of his civil rights, Pibouin has suffered, and will continue to suffer, among other things, mental and emotional injuries.

119.    Further, the discriminatory practices engaged in by CA were done with malice and/or reckless indifference to Pibouin's protected civil rights, such that, in addition to all the measures of relief complained of herein to which Pibouin is entitled, CA should be required to pay punitive damages as punishment for its vile, indecent, and reprehensible conduct, in order to deter CA and others similarly situated from such conduct in the future.

120.    As a direct and proximate result of CA's violation of Pibouin's rights under the New York City Administrative Code, CA is liable to Pibouin for compensatory damages in an amount to be determined at trial but not less than $1,500,000 and punitive damages in an amount to be determined at trial pursuant to §8-502(a) of the New York City Administrative Code.

28

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

121. As a direct and proximate result of CA's violation of Pibouin's rights under the New York City Administrative Code, CA is further liable to Pibouin for attorneys' fees pursuant to §8-502(f) of the New York City Administrative Code.

122. Pibouin therefore seeks judgment against CA for compensatory damages and punitive damages in an amount to be determined at trial but not less than $1,500,000, together with costs, disbursements, and attorneys' fees.

## COUNT VIII

### VIOLATION OF NEW YORK STATE LABOR LAW

123. Pibouin repeats and realleges the allegations contained in paragraphs "1" through "122" hereof as if fully set forth at length herein.

124. CA's conduct, at least insofar as CA continues to willfully withhold Pibouin's "non-discretionary" minimum guaranteed compensation -- misconduct which Pibouin, upon information and belief, understands CA has been guilty of with respect to other former employees -- constitutes a violation of Section 198, subdivision 1-a of the New York Labor Law, entitling Pibouin to appropriate compensatory damages, a statutory penalty of 25%, and fees under that statute.

## COUNT IX

### SEVERANCE

125. Pibouin repeats and realleges the allegations contained in paragraphs "1" through "124" hereof as if fully set forth at length herein.

126. Upon information and belief, each of CA's severance plans, practices and policies constitutes an employee benefit plan under the Employee Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. § 1000 *et seq.*, which was enacted to protect employees from employer abuses in the administration of private employee benefit plans. This protection extends to severance plans.

29

Exhibit A       Exhibit B       Exhibit C       Exhibit D       Exhibit E       Exhibit F

127.   ERISA defines "employee welfare benefit plan" as "any plan, fund, or program established or maintained . . . by an employer or by an employee organization, or by both . . . for the purpose of providing for participants or their beneficiaries." 29 U.S.C. § 1002(1).

128.   Under ERISA, a severance plan need not be in writing to fall within the protections of the act, provided that an employer has consistently paid severance, according to a formula, in the past.

129.   A company is also not required to create a special fund for severance payments in order for the company's severance plan to fall within ERISA's coverage; the funds for severance payments may come from a company's general funds.

130.   The determination that a severance pay practice is an ERISA plan requires only that the trier-of-fact conclude that from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of intended beneficiaries, the source of financing, and the procedures for receiving benefits.

131.   Under ERISA, because CA terminated Pibouin's employment, Pibouin is entitled to severance benefits pursuant to the most favorable severance arrangement applicable to Pibouin, which CA improperly withheld.

132.   ERISA also allows for the recovery of reasonable attorneys' fees and costs in an action to recover benefits, including severance payments. 29 U.S.C. § 1132(g)(1).

133.   The Court should direct CA to pay Pibouin his severance, together with interest and attorneys' fees. CA has unequivocally made it clear to Pibouin that unless and until he executes a general release in CA's favor, Pibouin will not pay CA his severance (and/or any other) payments. Pibouin has refused to do so in light of his other, substantial claims. If the court requires Pibouin to execute a release in order to receive his severance, Pibouin is willing to, so long as by doing so he

30

does not release or waive his other claims.

WHEREFORE, Pibouin demands judgment in an amount to be determined at trial but believed to be in excess of $2,250,000, together with interest, statutory sanctions, punitive damages, attorneys' fees, costs, disbursements, and such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       February 8, 2007

WECHSLER & COHEN, LLP
*Attorneys for Plaintiff*

By:_____
      David B. Wechsler
      Kim Lauren Michael
17 State Street, 15th Floor
New York, New York 10004
(212) 847-7900

31

Exhibit A    Exhibit B    Exhibit C    Exhibit D    Exhibit E    Exhibit F

## ATTORNEY'S VERIFICATION

**KIM LAUREN MICHAEL**, an attorney admitted to practice before the courts of New York State, being duly sworn, deposes and says as follows:

I am associated with the law firm of Wechsler & Cohen, LLP, attorneys for Plaintiff in this action.

I have read the Verified Complaint and believe the contents to be truthful and accurate. As to those items alleged upon information and belief, I believe that they, too, are truthful and accurate based upon my review of documents pertaining to this action.

I submit this Verification instead of the Plaintiff because Plaintiff does not reside in the same county where my law office is located (*i.e.*, New York County).

Dated: New York, New York
February 8, 2007

KIM LAUREN MICHAEL

 About CA

> Our Company
History
Company Overview
Board of Directors
Executive Management
Careers
Sponsorships
Industry Analysts
Public Affairs
Office of the CTO
CA Labs
Procurement
Deferred Prosecution
Agreement
Contact Us
> Our Customers
CustomerConnect
Sales
Customer Successes
Solution Centers
Partners
User Groups
Customer Quotes
> Our Beliefs
CA Core Values
Code of Ethics
Quality + Innovation
Corporate Governance
Community and
Philanthropy

COMPANY OVERVIEW
# WHO WE ARE

CA is one of the world's largest IT management software providers. Our software and expertise unify and simplify complex IT environments in a secure way across the enterprise for greater business results.

We call this Enterprise IT Management (EITM™) — our clear vision for the future of IT. It's how you can manage systems, networks, security, storage, applications and databases securely and dynamically. You can build on your IT investments, rather than replacing them, and do so at your own pace.

Our more than 5,300 developers worldwide create and deliver IT management software that keeps our vision real. And we've taken our decades of experience solving complicated IT problems and developed practical paths for you to get from where you are today to where you want to be — from point A to point B.

Founded in 1976, CA today is a global company with headquarters in the United States and 150 offices in more than 45 countries. We serve more than 98% of Fortune 1000® companies, as well as government entities, educational institutions and thousands of other companies in diverse industries worldwide. We are driving our next level of growth through our four-part strategy of product development, leveraging partners, global expansion and strategic acquisitions — all with the goal of helping our customers realize the full power of IT to drive their business.

investor relation

**Stock Symbol:**

**Revenue:** $3.7
in Fiscal Year 20

**Number of em**
Approximately
of March 31, 20

contact ca

**World Headqu**
CA, Inc.
One CA Plaza
Islandia, NY 11

**Main Phone:**
+1 800 225-52
or
+1 631 342-60

**Main FAX:**
+1 631 342-68

**Product Inform**
+1 888 423-10

**Contact**    Legal Notice    Privacy Policy    Site Map
Copyright © 2007 CA. All rights reserved.

http://www3.ca.com/about/content.aspx?id=80144                    2/8/2007

Exhibit B          Exhibit C          Exhibit D          Exhibit E          Exhibit F

Jean-Philippe Pibouin

**From:** Perlman, Steven B
**Sent:** Sunday, October 31, 2004 8:13 PM
**To:** Palazzo, Christopher J
**Cc:** Pibouin, Jean Philipp; Collins, Kevin M; Nixon, Bernadette V
**Subject:** RE: About numbers...and WEP

Chris,

You and I were sitting together last month when you "fixed" this problem with JP's com plan. This is absurd, what do have to do to make sure we get him paid and that he doesn't have to wait until November's close? JP has been more then patient and has been one of the companies top contributors.

I need to have a course of action on Monday, November 1st.

Steve

---

**From:** Pibouin, Jean Philipp
**Sent:** Sunday, October 31, 2004 9:18 AM
**To:** Perlman, Steven B; Collins, Kevin M
**Cc:** Pibouin, Jean Philipp
**Subject:** FW: About numbers...and WEP

Steve, Kevin,
7 months are behind us within FY2005, and I still didn't receive any commissions this fiscal year. I booked more than $9M revenue, and as you know the team and I have a great forecast for Q3 and we are continuing to grow exponentially the pipeline for FY2005. As we discussed with you and Bernadette last August, I am also still waiting for an updated WEP that would includes changes for few parameters as proposed in the below email. I am committed to continue to do everything I can to contribute highly to the success of the Northeast area but I need your help and support to resolve these issues ASAP. I believe that my requests are not unrealistic. I would appreciate if I could be treated like any of my counterparts in getting an updated WEP and commissions paid in a timely manner.
Please escalate this again to Bernadette.
Thank you for your support.
Regards,
JP

**From:** Pibouin, Jean Philipp
**Sent:** Monday, August 23, 2004 4:06 PM
**To:** Collins, Kevin M
**Cc:** Pibouin, Jean Philipp
**Subject:** FW: About numbers...and WEP

Kevin,

As promised please find below the email I sent to Steve and I gave a copy to Bernie.
As I told you, as of today, I didn't receive any commission; but on JPMC AXA and SG, we booked:
-    10 products deals for $8,789,659
-    12 Services deals for $412,402

The issue regarding the decrease of my IC from $250K to $150k could perhaps be solved creating a new $200k

04/13/2006

IC for the Global Account Director who leads on one account several ADs and Teams across several territories...

Regards,
JP

**From:** Pibouin, Jean Philipp
**Sent:** Thursday, August 05, 2004 2:29 PM
**To:** Perlman, Steven B
**Cc:** Pibouin, Jean Philipp
**Subject:** About numbers...and WEP

Steve,
Last year, my management asked my recommendations in term of AD quota on all my accounts.
I based the numbers I gave on what I had in SFS, what has been achieved in term of revenue the past years and on the Bank One acquisition regarding JPMC.
My recommendations were:

## AXA
Total Product Quota $4M and $800K for Services
~$3M in New product based on SRM, IMS and eTrust
~$1M in Capacities
Last year, we had no time deal in SFS because we could not get BV on a 1year renewal. The Deals could be booked on a worldwide basis signed globally or locally.

## JPMC
Total product quota $10M and $200K in Services
~$5M in Time based on the 5000 Mips renewal
~$4M in Capacity based on the Autosys deal
~$1M in New product (Advantage products, iCan,...)
I also defined that the additional revenue that would bring us the acquisition of Bank One would balance the revenue that we would distribute. The Services numbers was low because of the difficulty to sell services in the IBM outsourcing environment.

I just received my first WEP, and I have the following remarks:
1- My $8M Product Quota doesn't match my recommendations; if we split AXA in 3 (Jean, Michael and myself), my Product quota should be $6.8M: $1.3 on AXA, $5M on JPMC shared with Jennifer, and a maximum of $500K on SG that I also share with Michael
2- $800K Services quota doesn't make sense. It should be more $300K-400K
3- The fact that I have deals in SFS moving from FY04 to FY05 makes me get a big quota. The issue is that I understood that the ratio that Finance/ Executive Mgt. defined is 30% time and 70% New Product and Capacity. It means that my quota on NP/Capacity is to big compare my Time quota. Everybody Knows that, as of today on these big accounts, our big deal are still mainly Time... So when I close a NP/Capacity deal my rates are so low that I don't make money and when I close a Time deal I also don't make money because my rate is 0.19%. The solution for me will be to spend 90% of my time on NP and Capacity, but unfortunately, on these big accounts the ADs carry and close the big deals because of the relationship we have and the size of the deal. So we victim of our success.
The best example showing that the rates are not appropriate to the deals we signed is that with the $7.3M deal we signed at JPMC in June, I am at 44% of my quota, 21% of my IC and made only $31K....this is not a lot of $ for a deal that has been presented as the Example in term of engaging partners (IBM) including NP and Capacity in renewal deals...without giving the store away, maintaining or run rate...
4- My IC last year was $250K and is $150K for FY05...this is not fair knowing that I made my quota last year...

My recommendations in term of WEP are:
- Give SG only to Mike and increase his quota to $3M. We don't need 2 ADs and I am enough busy with JPMC and AXA
- Only Split AXA between 2 ADs (Michael and myself with $2M each) and paid Jean in Europe as an

04/13/2006

additional sales overlay on $4M
- My Services quota should be $400K
- My product quota should be $7M ($5M for JPMC and $2M for AXA). Michael should have $2M for AXA ($1M for SG) and Jennifer should have $5M on JPMC (Altria, Pfizzer?)
- The split between Time, NP and Capacity should be: 50% Time and 50% NP/Capacity
- I don't know how you can justify the reduction of my IC....

Thanks for you help to resolve this in a timely manner. I closed a lot of deals and still didn't make any money
Regards,

JP

04/13/2006

# Key Customer Roles



There are several customer facing roles at CA. This document is designed to give you an overview of some of those roles so that you can easily compare and contrast them:

**Account Director (AD)**

**The AD owns all aspects of the relationship between the customer and CA. The AD's roles and attributes include:**

- Owns executive and business relationships
- Account strategy and planning, opportunity planning/identification, forecasting and closing associated business
- Works across all CA technologies, services, and education
- Insures customer is receiving returns on their investment in CA technology
- Positions CA solutions for customer's needs
- Uncovers opportunities within the accounts; builds pipeline and leverage Sales Executives to manage specific opportunities.
- Coordinates and motivates the CA (and partner) virtual account team, technical, support, and/or executive resources as need by the customer

**Role is provided by CA's account coverage model for Tier 1 accounts.**

**Account Manger (AM)**

**The AM owns all aspects of the relationship between CA and associated named accounts. The AM's role and attributed includes:**

- Owns executive and business relationships
- Account strategy and planning, opportunity planning/identification, forecasting and closing associated business
- Works across all CA technologies, services, and education
- Insures customer is receiving returns on its investment in CA technology
- Positions CA solutions for customer's business needs
- Uncovers opportunities within the accounts; builds pipeline and manages opportunities for Tier 2 Emerging Accounts or leverage Sales Executives to manage opportunities for Tier 1 Emerging and Tier 2 Enterprise accounts.
- Coordinates and motivates the CA (and partner) virtual account team, technical, support, and/or executive resources as need by customer

**Role is provided by CA's account coverage model for Tier 1 Emerging and Tier 2 Enterprise/ Emerging accounts**



**David Wechsler**

| | |
|---|---|
| **From:** | Francis, Brian [brian.francis@gs.com] |
| **Sent:** | Tuesday, April 18, 2006 5:37 PM |
| **To:** | "Pibouin, Jean Philipp"@mta5.srv.hcviny.cv.net |
| **Subject:** | Post Contract Follow-up |

JP,

Just a quick note to thank you for your efforts in forging the Mainframe Products contract renewal. I believe there were distinct benefits shared by both parties at the conclusion of our discussions.

Regards,

*Brian Francis*
Core Infrastructure
Office of the COO
Goldman, Sachs Inc.
(212)-855-9182
5*9182

4/25/2006

# REDACTED

**From:** Goodman, Andrew
**Sent:** Mon 5/8/2006 9:08 AM
**To:** Pibouin, Jean Philipp
**Subject:** RE: Important Matter

JP,

I appreciate you taking the time to write to me, you can be assured that we will follow-up and be in touch with you shortly regarding the issues you raise.

Regards,
A

**From:** Pibouin, Jean Philipp
**Sent:** Sunday, May 07, 2006 10:59 PM
**To:** Goodman, Andrew
**Cc:** Pibouin, Jean Philipp
**Subject:** Important Matter

Dear Andrew,

Consistent with what I understand is my obligation, I write to advise you of my serious concern over a comment made to me on March 1, 2006, by Steve Perlman. Specifically, during a team meeting that took place in the Manhattan office (about nine people were present, in person or on the phone), upon my referring to a client with a strong accent, Steve looked directly at me and stated: "I hate people with strong accents." This is not the first comment of this sort made by CA personnel, and — coupled with the recent diminution in my title and role at CA — I believe it necessary bring this to your attention. The negative and disparate employment treatment I have been suffering is inconsistent with any good faith objective and subjective assessment of my performance, and hence unwarranted. As a result, I question what are the real reasons underlying my deteriorating situation at CA.

Frankly, I struggled for the past few weeks, in light of all the events going on, whether to inform you of the above, but in the end felt it was both important and my duty. I also concluded that, while I respect the process of lodging grievances through the CA Compliance and Ethics Helpline; it would be best to contact you directly. I can make myself available on reasonable notice should you wish to further confer. I am intentionally not sending a copy of this memo to Steve, believing it is up to HR to decide how best to handle this situation. Rest assured that notwithstanding my above-noted concerns and my ongoing compensation and other employment issues with CA, I shall continue to diligently

5/8/2006

perform my role for CA in the most professional of manners, albeit under these troubling circumstances.

Best Regards,

Jean-Philippe Pibouin






Powered by


# CA: America's most dysfunctional company

**Two years ago Computer Associates admitted $2.2 billion in fraud and recruited a new CEO to save the day. Has it solved its problems? Fortune's Nicholas Varchaver reports.**

**By Nicholas Varchaver, Fortune senior writer**
November 16 2006: 11:27 AM EST

FORTUNE

**Have you checked your credit report recently?**

Yes

No

(Fortune Magazine) -- On Nov. 2, Sanjay Kumar walked into a Brooklyn, N.Y., courtroom to receive his punishment for the $2.2 billion accounting fraud and cover-up he orchestrated at the software company formerly known as Computer Associates (Charts).

The ex-CEO read a statement that expressed regret - "I take full responsibility for my actions and apologize for my conduct" - with all the remorse of a man reciting a grocery list. The judge then sentenced Kumar to 12 years in federal detention.

A few hours later, just 45 miles away on Long Island, the man hired to clean up the mess left by Kumar, CA chief executive John Swainson, read a script of his own on a conference call to announce the company's quarterly earnings.

The news was gloomy, with CA's most cited metric - cash flow from operations -down 98 percent from the equivalent period a year ago. Swainson asserted that cash flow would quickly rebound. "Obviously, you guys are working through a lot of issues here," one analyst asked. "I'm just wondering: Is this next quarter the quarter we're going to see big improvement here?" After a pause, Swainson offered a curt four words: "I certainly hope so." He didn't elaborate.

Two years after Swainson joined CA, the longtime IBM (Charts) executive is still struggling to turn around what may have been, simply put, the most dysfunctional big corporation in America.

When he arrived, the nearly $4 billion-in-revenues company had barely avoided federal indictment for securities fraud and obstruction of justice - Swainson has called it a "near-death experience" - and had negotiated a deferred prosecution agreement, which essentially put the company on probation. Eight former senior executives, including Kumar, would eventually plead guilty to fraud, obstruction of justice or both.

Since then Swainson has embarked on an energetic and comprehensive series of reforms - staking out a commitment to ethics, taking concrete steps to transform a sales culture that treated customers as adversaries and making more than a dozen strategic acquisitions.

But for CA, shoddy ethics have been replaced by bumbling execution. While revenues and earnings have inched upward, cash flow - the constant that has sustained the company during its darkest moments and persuaded a coterie of investors to remain shockingly loyal to its stock - is sagging.

More to the point, this year CA has endured an embarrassing run of mostly self-inflicted calamities: two accounting restatements, a late 10-K, an earnings miss, a bond downgrade, a fiasco over sales commissions and an exodus of executive talent.

Most humiliating of all, in September the company had to admit that two years after agreeing to fix its accounting systems - one of many conditions of its deferred prosecution agreement - its processes are still broken. CA endorsed a 72 month extension for the court-appointed monitor who oversees its probation, which was probably a wise endorsement given that an indictment was a possible alternative.

### A problematic business

One reason it's been so hard to fix CA's internal systems is that the company barely had any. In fact, it turns out that the business-software powerhouse - which has products ranging from database management to storage and security running inside more than 95 percent of the companies in the Fortune 500 - had never really bothered to use business software. We're not kidding. It took the threat of the deferred prosecution agreement to persuade CA to begin installing a major enterprise-software system, which it is buying from another software company, SAP (Charts).

This remarkable creation - a $4 billion company run like a 20-person startup - is in large part the legacy of CA's feisty departed co-founder Charles Wang and Kumar, the brilliant charlatan who helped build - and then nearly destroyed - it.

Kumar and Wang, who now spends much of his time overseeing his hockey team, the New York Islanders, created a sharp-elbowed, sales-obsessed culture, a company proud of its Long Island heritage.

Indeed, Island stalwarts ranging from former Senator Alfonse D'Amato to former New York Stock Exchange chief Dick Grasso figure in the saga of CA as board members. Everyone was there, it seems, but Joey Buttafuoco.

That's a lot for Swainson to overcome - and as the setbacks mount, the pressure is building. Despite his good-faith efforts to restore CA's good name, the CEO has lost support from some inside the company for the perquisites he enjoys - new offices, new helicopter pad, generous compensation - even as he asks the rank and file to sacrifice.

Viewed individually, CA's challenges appear daunting but solvable. It seems plausible that - eventually, anyway - CA will be able to fix its internal systems. Over a period of years the company may be able to mend its deeply troubled relations with its customers. And it shows some signs of transforming a culture that could be described as - whatever it takes to get my commission - and replacing it with one that values collaboration and customer service.

The problem is, these aren't separate issues; they make up the core of how CA has always done business, the DNA of the company. And it raises a critical question for CA and for any CEO who has ever attempted to revive a deeply troubled company: Can you change the very soul of a corporation? And can you do it when the company's business is being squeezed from every direction?

### The barnacle of corporate America

On the mostly empty wall across from John Swainson's desk in CA's Manhattan satellite office is a framed charter. It's the CEO's statement of principles, a manifesto that trumpets virtues such as serving the customer.

The charter is covered with signatures from many CA executives (more than a few of whom have already departed). Swainson has even distributed little cards, which can be attached to a key ring, to the company's 15,000 employees. The cards list "core values" such as "innovation," "excellence," "teamwork," and "integrity."

"We're in the middle of a cultural transformation," says Swainson, an earnest 52-year-old Canadian. He concedes that, on the earnings conference call a few days before, he probably should have given the analyst a fuller explanation of his reasons for optimism.

"It was a bit of an emotional and stressful event.... I should've said, 'Look, I believe in this company. I think it has all the ingredients for success. It has good people. It has good products. And t has an improving set of customer relationships.' That was the original promise that brought me here in the first place. And that continues to be the promise that keeps me here and keeps me believing in it."

Swainson candidly admits his stumbles and chalks them up to the enormity of the challenge and the fact that he needed to attack on multiple fronts at the same time. "We were just doing an awful lot of things at once," he says. "And a couple of the balls dropped in the process. And we picked them up and kept running."

He acknowledges that at the outset, "I sort of perceived, perhaps a little bit naively, that I would spend a small amount of time cleaning up the problems and a large amount of time focused on growth and strategy. What I didn't anticipate at the time was that we hadn't yet fully done the first part of the job, which is clean up from the past." The CEO says CA is two years into a five-year transformation.

To grasp why Swainson thinks he needs five years, consider the old Computer Associates. For all its ubiquity inside the tech departments of corporate America, CA had a horrendous reputation. Where Microsoft (Charts) has long been the most feared software company, the old CA claimed the title of most despised - not by competitors but by its own customers.

The reason was baked into its business model. The company has long specialized in unglamorous but highly lucrative software, often for giant mainframe computers.

One of CA's signature products, Unicenter, allows IT managers to monitor, diagnose and manage other systems and software. For example, it can detect if a server is about to crash and help an IT person redirect data to stave off the problem.

These products made it the barnacle of corporate America: Once you had CA software onboard, it was so onerous and expensive to pull it out that few customers ever did. That led to a lot of steady cash flow - and to arrogance on the part of CA's management.

### The do-nothing corporate culture

CA's acquisition binge - it snapped up some 85 companies in the 80s and 90s - merely compounded the problems. Its method was simple: inhale each new operation, toss much of the acquired staff overboard, and then flip the newly purchased products into "maintenance mode." That's software jargon for abandoning any attempts to invest in or update the products. Incensed customers would find themselves stuck with millions of dollars worth of software that was slowly becoming obsolete. But hey, that was their problem, right?

CA was gushing profits, and as far as the company was concerned, the best policy was to ignore the customer. Certain exceptions were made, of course: at contract renewal time, when the hard sell kicked in; or if CA thought the customer was violating the terms of its license, in which case there were threats or even a lawsuit.

The man most responsible for this culture was Wang, CA's combative co-founder. A Chinese immigrant who was raised in Queens, he didn't surround himself with Silicon Valley code writers or white-shirted Ivy League middle managers. Rather, his people were salesmen, pure and proud, who embraced their blue-collar roots in Brooklyn, Queens and Long Island, and had the accents to prove it.

As Sanjay Kumar told Fortune in 1997, "It helps if you grew up on the wrong side of the tracks." Kumar himself had risen from poverty as a Sri Lankan immigrant in South Carolina. He kept his job when the company he worked for was acquired by CA in 1987 and then enjoyed a meteoric rise that would make him president in 1994, CEO in 2000, and finally chairman and CEO in 2002.

But even as the company grew into a multibillion-dollar enterprise with thousands of employees, it remained small in mindset. It was run like a startup - largely out of the brain of Wang and later Kumar. Notoriously frugal in the early years, Wang saw no pressing need to, say, invest in software systems for his own company.

### Greed and arrogance

Success and arrogance, familiar partners, were in ascendance at CA. They were soon joined by an equally familiar third colleague: hubris. Those qualities coalesced memorably in 1998, when word got out that Wang, co-founder Russell Artzt (a quiet programmer type who still works at CA), and Kumar would split $1.1 billion in stock - a figure nearly as great as the company's entire profits for the year.

As it happens, one of the members of CA's compensation committee was Grasso, who would later encounter his own legal problems over the $100 million-plus he received at the NYSE. (We'll say this much for Grasso: He was consistent in his philosophical commitment to full pecuniary recognition for top executives.)

In an instant, a company that had been little known outside its own industry gained widespread notoriety for outlandish corporate greed. Worse, CA managed to make enemies of what had been a very contented group, its own shareholders. Some filed suit, and the top dogs agreed to return $250 million.

Investors weren't worried, though: The company was in the hands of a reformer. At least that's how Sanjay Kumar billed himself. By 2002, Wang had left to focus on running the Islanders (where he's earned an eccentric reputation: Just this summer, he fired the team's general manager six weeks after he hired him and replaced him with the backup goalie).

And Kumar, fully in charge, repeatedly proclaimed himself committed to the "gold standard" of governance.

Kumar even appeared to be backing up his rhetoric with action. He made CA's revenue-recognition policies dramatically more conservative; announced initiatives to repair customer relations; and in 2002 brought respected independent directors such as former chief SEC accountant Walter Schuetze to CA's board.

But Kumar was a liar, of course, and an astonishingly convincing one at that. And for a long time even an astute accountant like Schuetze was hornswoggled. As the director puts it, "Kumar could sell sand to Saddam Hussein."

Eventually, though, the dimensions of the $2.2 billion accounting scandal emerged. For at least three years the company had kept its books open after the end of each quarter (the so-called 35-day month) so that it could grab enough revenues from the succeeding quarter to make its numbers and keep its stock price up.

Kumar conspired with the CFO, head of sales, general counsel and others not only to backdate hundreds of contracts and alter documents, but to lie about it, first to internal investigators, and then to the SEC and FBI.

By the spring of 2004, Kumar had stepped down, and it had become clear that the malfeasance was so grave that CA faced possible indictment. For months, two independent directors - Lewis Ranieri and Schuetze - and the company's lawyer negotiated with federal prosecutors and the SEC.

Finally in September 2004 came the deferred prosecution agreement: CA acknowledged that its former executives had committed fraud and obstructed justice and agreed to pay $225 million in restitution to shareholders as well as undertake dozens of corrective actions.

The latter included detailed steps to overhaul CA's accounting and financial control systems. In addition, the agreement provided for the appointment of an independent examiner to monitor CA's compliance with the agreement. If CA fulfilled all of its obligations within 18 months, an "information" (the equivalent of an indictment) that had been put on hold would be dismissed permanently.

CA had survived. Now the real work could begin.

### The sheriff and the software guy

In selecting John Swainson two years ago, says CA's current chairman, Lewis Ranieri, the board wasn't looking for a celebrity CEO or even a corporate sheriff. "What we needed was a software guy," he says. "We could've hired people who had more glitz, but we wanted substance."

Ranieri is the former Salomon Brothers banker and real estate investor made legendary in Michael Lewis's book "Liar's Poker" as the outsized - in every sense of the word - creator of the $6.2 trillion mortgage-backed securities market.

Gruff and frank, Ranieri is nobody's idea of a polished diplomat. In his mouth, the word "fiscal" comes out sounding like "physical." He's the sort of character who seems to call for the description "cigar-chomping" even though a stogie is nowhere in evidence during our interview.

Ranieri might not have seemed an obvious choice to lead a cleanup. But lead it he did, and there are those who credit him (and Schuetze) with saving CA. Through much of 2004 and into early 2005, Ranieri actually ran CA on a daily basis alongside an interim CEO.

The directors had ousted more than a dozen senior executives - "Sometimes I felt like Robespierre, sending a never-ending stream of aristocrats to the guillotine," says Ranieri - and begun hiring replacements, bringing on a new general counsel and CFO before Swainson. As far as Ranieri was concerned, he and his general counsel and compliance team could be the sheriffs while his new CEO could focus on software and strategy.

Ranieri got exactly what he was looking for. Swainson is truly a software guy - he can write code. Other than a couple of years as a mining engineer in his native British Columbia, Swainson had spent his entire 26-year career at IBM and had risen to vice president of worldwide sales for its software group at the time he was tapped for the CA job.

From where Ranieri sat, Swainson - low-key, bordering on phlegmatic - had just the right qualities: He knew software, he was credible, he was smart and he was honest. But at least one CA executive wondered whether intelligence and decency would be enough.

"Who do you get after Richard Nixon?" asks the executive, who has since left CA. "Well, you bring in Jimmy Carter." Would good intentions add up to effective leadership?

### Big changes at the new CA

Swainson's candor was certainly refreshing. At his first meeting with industry analysts, his honesty floored the attendees. "He admitted *everything*," recalls Steve Duplessie, founder and analyst at the Enterprise Strategy Group, "and took it all right on the chin. And I'd never seen anyone from CA do anything but flagrantly lie to me before."

Swainson and his team began moving fast. As part of the deferred prosecution agreement, they made employees attend ethics courses (with consequences for their paychecks if they didn't show up) and created an ethics hotline. Meanwhile, the CEO was soothing customers. He listened to their concerns, renegotiated existing deals with longtime buyers, and reduced prices to win loyalty.

Operationally, Swainson was equally busy. He reorganized the company along product lines and began altering the sales organization so that each customer would have a designated CA sales rep - a far cry from the previous geographic organization, which allowed a huge number of salespeople to vie for any piece of business. And he reworked the commission structure to reward behavior that would help customers.

Meanwhile, to address yet another pressing need - new products to round out CA's platter of software offerings - Swainson scooped up 16 small companies for a total of $1.6 billion. The deals were widely viewed as smart pickups. And unlike in the past, CA beseeched the acquired companies' staff to stay on and committed itself to supporting their products.

As the end of 2005 neared, CA had made impressive progress. Yes, there had been another restatement, but it was one more buried sin from the Kumar era; Swainson couldn't be blamed for that. Signaling that the company's troubles were relegated to history, the CEO also announced that Computer Associates was officially changing its name to CA.

In a blog posting to CA employees on Nov. 23, 2005 - a year and a day after his arrival - the CEO called 2005 a "year of progress." Looking toward 2006, he noted that "completing our obligations under the deferred prosecution agreement is an important goal," and added, "Hopefully, we won't have many distractions to contend with." Before concluding with best wishes for a happy Thanksgiving, Swainson told his employees, "It's going to be an exciting year."

### The helipad and the perks gap

Swainson had entered CA on a wave of relief and good feelings. But trying to change a culture, he would learn, is

treacherous terrain. Most employees supported him, says Ted Williams, who was a senior vice president in CA's worldwide sales division from summer 2005 until spring 2006, when he left to become CEO of Canadian software-maker Activplant.

But not everybody was galvanized. "There were two camps," he says. "One was the new camp, which got a lot of visibility under Mr. Swainson, in that they were very, very devoted to turning the company around and willing to do it at almost any cost with as much energy as it took. And then you had the larger mass of people, who had a culture of - it didn't have that much urgency." Indeed, some veteran employees were irked at what had happened to CA, but preferred to blame the problems on prosecutors, the SEC, or the press.

One former executive argues that the old regime's approach - micromanaging and hoarding all the crucial decisions - had fostered what he calls a "culture of corruption."

In his view, employees were so used to blindly doing what they were told that some didn't know how to respond when Swainson tried to diffuse power among different levels. In the past you could just call Kumar for a decision. Now there was a whole hierarchy.

This change - intended to bring a mature, big-company culture to what had been a free-for-all - met with resistance. What Swainson considered processes, others saw as artery-clogging IBM-style bureaucracy. People groused that you needed 12 layers of approvals to order a ream of paper for the copier.

That extended even to introducing new products, says Chris Broderick, a former senior vice president who spent eight years at CA before becoming CEO of CoreStreet, a provider of software solutions for large identity programs, earlier this year: "The period of time it would take to go from idea to innovation to delivery was much shorter [in the past] than it is today." Though he doesn't condone the sins of the previous regime, Broderick asserts that "the leadership at that time was far stronger."

Some of this may simply have been a longing for happier times and thus hard to blame on Swainson - but then there was the helicopter. Swainson didn't want to move to Long Island from his Connecticut home. Instead he choppered in once a week in the company helicopter.

In September, CA even commandeered an unused part of the employee parking lot to build a new helipad. (Swainson explains that he moved the helipad because CA had previously been in the habit of landing its helicopters on a children's playing field for CA's day-care center, which turns out to be a pretty good example of the old CA's unique combination of executive grandiosity, luxury - and family benefits.) Meanwhile, the company opened a second office in New York City for Swainson and some of the other top executives.

As this was happening, CA employees were being hit by three consecutive rounds of layoffs (one of which began before Swainson's tenure) that would end up costing 3,200 people their jobs. And CA was slowly squeezing those workers who kept their posts: It ended 401(k) bonus payments it had traditionally paid and leaned on employees for larger contributions to their health insurance.

CA killed its free breakfasts for staff and put the kibosh on the free towel service in the company gym; it even canceled the Rolexes that employees had always received on their 10th anniversary at the company.

Many of these, it is true, were not critical benefits. But the contrast between the treatment of average employees and top executives and board members (who voted themselves a $25,000 pay increase in 2005) was jarring.

The perks gap darkened the mood inside CA. One employee even screwed up the courage to raise the issue in a message posted on Swainson's internal blog this past spring: "How does it contribute to employee morale to address the bad numbers caused by what you acknowledge to be upper-management errors by doing away with the discretionary 401(k) contribution while the upper managers who made these boo-boos continue to receive bonuses and other bennies of that sort? I can assure you that where I worked it has not been well received."

Perhaps not, but CA's board is unmoved. "I think Swainson should be in the helicopter," says CA director Schuetze. "I want him spending his time looking after CA. I don't want him in a traffic jam on the Long Island Expressway."

## Another self-inflicted wound

A lot of things have gone wrong for CA in 2006, but if there is one example that embodies the company's travails, it is the debacle over sales commissions. Because Swainson had reorganized the sales staff to improve customer relations, it was necessary to adjust the commissions. So the CEO assigned his top sales executive to redesign the plan.

Two problems quickly emerged, says former CA executive Williams, who was brought in to try to keep the plan from spinning out of control. First, he says, "the actual commissions plan - the document - was very, very confusing, almost impossible to interpret." Worse, perhaps, was the second impediment: implementing it on CA's sclerotic internal computer systems.

CA, Williams says, had a brigade of 15 spreadsheet jockeys in the finance department who were assigned the unenviable task of individually calculating each commission for the company's 4,000 salespeople.

As Williams puts it, "A lot of the internal systems were internally developed and had not been updated, had not been integrated together. So it was a very much a spaghetti code of an application. And no one could believe any of the data." The 15 finance staffers had to "verify the data that no one believed and then ultimately to certify it and put it back into the system."

Somehow the finance team had managed to keep things together under the old commission system. But adding the complex new plan and combining that with the logistical hassle of adjusting for the commissions earned by sales staff at the companies newly acquired by CA was more than they could handle.

Finally, this spring, CA realized quarterly commissions costs would be $75 million larger than expected. That was enough to make CA miss its earnings estimate for the quarter ending March 31.

The reaction inside CA's finance department, it appears, was panic. Word leaked that the company was considering paying salespeople only 40 cents on the dollar for their commissions during the quarter.

The result, says Williams, "was like a revolution in the field." CA's lawyers then weighed in and concluded that paying only a portion would be illegal in most jurisdictions. (Swainson says the company also didn't want to alienate its best salespeople.) So CA distributed full commissions for the salespeople, while sales managers got only 50 cents on the dollar.

Soon after the commission disaster, CA's head of sales and its CFO departed. For Swainson, the mess was an educational experience. "One of the learnings that I had," he says, "was that you can't simply stand on top of the mountain and say, 'Fix anything.' You have to be very much involved in the process... When you come out of any organization that's working well, whether it's IBM or GE or wherever, when the CEO says something it happens, because the systems all work. And in a company that's going through a crisis the systems don't all work. So you can't just stand on top of the mountain and issue pronouncements."

He calls the commission plan "a good idea that wasn't properly implemented.. And it bit us in the ass and it bit us hard. We didn't, in retrospect, understand what it was going to do. And when it did it, we didn't have any way of mediating. It's a good example of what happens when your IT systems really can't support your business processes."

### More 'ghosts of Christmas past'

In theory, such a disaster can't happen again. The company has simplified the commission plan. And as part of its agreement with the government, CA is in the midst of a multiyear installation of so-called enterprise resource planning software (the product it's buying from SAP).

The ERP software should provide the backbone for all of CA's internal systems, feeding data for everything from forecasting to commissions to the company's SEC reports.

The commissions meltdown forced CA into yet another re-statement, and it forced the company to disclose a "material weakness" in its internal controls.

As Swainson conceded in his blog in early June, "We don't have good communications inside the business to make sure that insights in one department are shared with others quickly, so that action can be taken before it's too late."